In this case, if I may, in this case, you filed a motion to hold the petition in advance because, why was that? Well, Your Honor, we believe he is eligible for adjustment of status to lawful permanent residency. He's married to a United States citizen. And I do want to point out, it was my... But the government filed an opposition pointing out that the fact that someone is eligible does not mean that it's going to be granted, so that's not sufficient basis to hold the petition in advance. So what's your response to that? Well, Your Honor, first of all, I do want to point out, I made an honest mistake in the motion. I stated in good faith that the visa petition had been granted. I was relying on part of Exhibit 1, which deals with the application for adjustment of status. And there's a box there that's marked, and it states that the application of the petition, rather, the visa petition has been approved. That, not to get too arcane about this, but when you file what's called a one-step adjustment at the local San Francisco Asylum office, and you have a United States citizen, in this case spouse, you mark that box because you're filing both the visa petition and the adjustment application. So the practice is to mark that box. I assumed that the visa petition had been approved. That was incorrect. I'm responsible. That is incorrect. It's my error, and I apologize. However, she did. Does that change your motion? No, it doesn't, Your Honor, and here's why. This is in the administrative record as well. She filed, when she was a lawful permanent resident, a visa petition for her husband. This is on page 8 of the administrative record. It was filed almost three years ago, April 19, 2001. The INS, former INS at that time, said it takes usually 815 to 825 days to process this type of case. According to that estimate, they should have decided this petition by August 2003. So we're more than eight months in delay. The bottom line is this, that the court has the, we would submit with all due respect to the court, the court has the equitable power to hold this case in abeyance because there's been at least a prima facie showing of agency delay in this case. He has a two-year-old child under a matter of valarty, which is a B.I. Counsel, when did you say the application was filed? The visa petition was filed on April 19, 2001. But your motion was based on the application for adjustment, which was filed March 23, 2004. That's correct, Your Honor, and the reason why that was filed was that the immigration judge, and this is also part of Exhibit 1 to our motion, certified the case back to the Board of Immigration Appeals. We had filed a motion to reopen and reconsider based on the marriage. The difficulty I have with this is it was filed, you know, the week before we're ready to have argument on this case. Yes, Your Honor. And it's just, I think it's a little. I can explain that, Your Honor, Judge Rawlinson. The decision by the immigration judge was on May 3rd to certify the case back to the Board. There's a jurisdictional issue. We were all expecting he was going to be adjusted in court, and that would be the end of the case. We'd file a motion here, and that would be the end of the case. But he certified it back. The jurisdictional question is not settled as to whether the immigration court has the authority to adjust or not. If it does, then we'll. Yes, Judge Schroeder. I'm sorry, but I thought there was no visa yet. There is an immediate visa number available. My understanding is that it's taking years to process those visa applications. It may be immediately available, but it's taking years. It is taking years, but the estimate here on page 8 of the administrative record, they said it was two years and three months for this petition. This was filed almost three years ago. It should have been decided by now. What we have done in the meantime is to, and it's not on the record, is to upgrade this petition because she is now a U.S. citizen. We also had to file. We're doing everything we can. We're in several different places here. We filed for expeditious adjustment at the San Francisco DHS office, which you can do. Grant this petition, that just adds to the backlog, doesn't it? To the backlog for? If we hold this petition for review and abeyance, that's just one more filing that's awaiting adjudication in this case. Well, Your Honor, they've been waiting for three years. The former INS has had very big problems at Laguna Niguel Service Center. I refer to page 40 of the administrative record, New York Times, January 31, 2003, federal indictment against INS contract officials. Well, this Court is trying to be expeditious in its rulings. Yes, Your Honor. I just, to me, I just prefer to go ahead and have the argument we've all prepared and make a ruling. Certainly. Certainly, I'm prepared to. Wait, wait, wait, wait, wait, wait, wait, wait. Yes. Could I ask the government a question? Well, before that, can I get an answer to one factual point? Okay, go ahead. The government says, and the government has written this too, just before the conclusion of its opposition to your motion, that, moreover, the record does not even contain any evidence that Petitioner is the beneficiary of any approved I-130 petition. Do you agree with that? That is correct. And as I said at the outset, that was my error, my mistake. I was looking at the application. I do want to make that clear. That's why I wanted to ask the government, if you could come forward, just both stay there just a minute. Okay. I'm very concerned about this situation. We're seeing recurrent cases where there is apparent entitlement to an adjustment of status, but the INS can't get it processed. So with respect to this case, do you have any idea how long it's going to take to get this processed? I don't know, Your Honor. I can't really say for certain. I did talk to the district counsel's office yesterday about this matter. And with regard to the petition that they filed just a few days ago, that they will take several months to process. They weren't sure exactly, you know, how long it will depend on whether it's complete and various other things, including they have to pay a large sum of money, which they haven't paid yet. This is they are asking for processing under specific statutory provision that requires a $1,000 payment. And so it could take months, Your Honor, to resolve it. What precisely has to be done? I don't know, Your Honor. But as Your Honors have pointed out, even though he is married to a U.S. citizen now, that doesn't guarantee that he will get or that he will be allowed to adjust his status. What does that mean? Does that mean there has to be some kind of an examination into the bona fides? Yeah, into the bona fides of the marriage, and there will be an interview, and there's some information missing from his original application that he has to provide, and then there's the money question to work out. This is going to take a long time. Your Honor, she said several months, I believe is what she said. Months, yeah, more than several months. And the best information I have is it would take about six months. But I do want to emphasize that the visa petition should have been approved by now. Once the visa petition is approved, then it's all downhill. This is a bona fide marriage. They have a child. It's a matter of validity on all fours, which is the BIA case, on motions to reopen in a virtually identical factual situation. In fact, the board sent it back for adjustment, and the judge said, wait a minute, we're only in asylum proceedings. It may turn out that, in fact, the immigration judge has jurisdiction to adjust. Let me ask the gentleman this question now. The fact that this petition for review is pending now before this Court, does that interfere with the, I don't know what it's called now, the Homeland Security's jurisdiction to address the petition for adjustment? Your Honor, it's my understanding that it would not. No, it does not, Your Honor. And I do want to draw the Court's attention to the case of Stone v. INS, the Supreme Court case 514 U.S. 386, in which the Court stated that the statute, the statutory scheme provides or directs that deportation orders are to be reviewed in a timely fashion after issuance, reviewed by this Court, irrespective of the later filing of a motion to reopen or reconsider with the board. So that stands for the proposition that this Court has directed, that Congress's intent is that these petitions be reviewed as expeditiously as possible, regardless of what's going on at the administrative level. What would be accomplished by holding the petition in abeyance? Yes. Simply that he could be adjusted to lawful permanent residency. But he could be adjusted if we decide the case, he could still be adjusted. Yes, Your Honor. We would prefer that the case be held in abeyance until there's a determination on the adjustment issue. You wanted to use it kind of as a hammer. Well, we believe that could be adjusted. Could he still be adjusted if we deny the petition and he's deported? He could not be adjusted, Your Honor, to the best of my knowledge, because there would be a 10-year bar to his return. There's no voluntary departure in this case. That's what I was going to ask. So we don't have that luxury. But, again, I do want to emphasize the agency is eight months late. We filed our motion to reopen this case the day after we filed the petition in this Court. So we have done everything we can do in our power to try to get some resolution of this. We're in several places right now. If we were to stay the mandate in this Court, would that have the same effect, assuming we did not deny the petition on the merits? Your Honor, I'm not absolutely sure. I know this is a 52-day period and all the rest, but I'm not sure that that would satisfy. I don't know for sure that it wouldn't, but we would prefer the motion to hold an abeyance based on the Court's equitable powers. And this case is being decided very timely, by the way, by this Court. So there's no issue there. But this is a question, we believe, of agency delay, which should not trump his ability and his opportunity to get adjustment of status in this case. Let me ask the government. Do you agree that if we were to deny this petition, and then presumably the petitioner would be removed, that would cut off all further proceedings on the adjustment of status? No, Your Honor, I don't agree with that. And I'm not sure exactly what the situation would be. But I was told, when I talked to the district office, that he could continue to pursue his application for visa and for adjustment outside of when he, if he was outside of the United States. And even if he's been deported without voluntary deportation? You know, this isn't, these aren't deportation proceedings. That's something I would need to look into because of the unusual process. You worry about that 10-year bar. Again, I would have to look into that and see if that applied in this case. I can't state whether, I mean, we can file something with the Court on that. Is there any further questions on this? All right. Do you want to hit the high points? I don't think we need extensive arguments. Yes, Your Honor. This is another substantial evidence case, Your Honor, where he did incur some discrimination and harassment in Indonesia. And so it's essentially personal experiences plus country conditions. There's also an issue as to the weight of the evidence that the I.J. gave in this case. I'd like to touch on briefly, and that is the I.J. unintentionally, when he gave his decision, a couple weeks later had forgotten that we had produced virtually all of the original personal documents in the case. And I believe that goes to the weight of the evidence in the case because the judge pointed out that he only had copies of documents that dealt with the issues of, I believe, ethnicity. Although he did find that he was ethnic Chinese and so on, but he was not convinced that he had provided all of these personal documents. We think that's a relevant issue as to the weight. He did incur, unfortunately he was not hurt during the May riots, but he did incur several incidents of harassment, discrimination. Also, he mentioned that his elder sister had been fondled on a bus by Native Indonesians. A younger brother was attacked by gangs, Native Indonesian gangs, demanded money, struck him on the head, and so on. So I'm not saying it's a garden variety case. Certainly nothing in Indonesia is to be described in that way. These are all very serious matters, of course. But he has certainly experienced his full share of discrimination. Thank you. Thank you, Judge. Good morning, Your Honors. Carol Federighi on behalf of the government in this case. Your Honors, I would like to just talk first about three cases that I think are important to look at as comparing it to the present case, and that's Prasad, which is at 47F3336, Singh, which is at 134F3962, and then the Hartuni case, which you've talked about, at 21F336. And we could see why this case is more like Prasad and Singh than like Hartuni. In Prasad, the petitioner had been stopped by a roadblock. He was an Indo-Fijian in Fiji, so it's a similar situation where there's an ethnic group that experiences a lot of discrimination by the ethnic, the indigenous population. So he was stopped at a roadblock. He was detained by the police. While he was detained, he was hit in the stomach and kicked. He was released after a few hours. It was a brief detention. Later, his house was stoned, and they attempted to steal property from his house. His wife was harassed by members of the Fijian army in sort of a vague, undescribed way. They never detained her or spoke to her directly. His cousin was killed, and his cousin's wife was raped by soldiers. The court held that these incidences did not compel a finding that the petitioner had a well-founded fear of future persecution. We submit that that case is very analogous to the present case. In that case also, many of the petitioner's relatives were still residing in Fiji without incident, and that is similar to this case in which the petitioner's family has been living safely in Indonesia since the Indonesian riots in 1998. And the court noted in that case first that even if there are conditions of discrimination in the country of origin, as in this case, the alien must still show particularized individual persecution before asylum will be granted. So that's Prasad N. Singh. The ‑‑ excuse me for a second. I think we're familiar with that. Okay. Yeah, it's a similar situation again to this. And then Hartouni. The court has asked how does Hartouni differ from the present case. Well, in Hartouni, it's a case of a Christian Armenian living in Iran, and the State Department had held that Christian Armenians were presumptively eligible for asylum. So there's nothing like that in this case. The State Department has, in fact, said that attacks on ethnic Chinese have dropped sharply in recent years. So with that particular State Department finding, we have a totally different situation. In that case also, in addition to this general ruling on the whole population of Armenian Christians, the petitioner had shown that the persecution of Christian Armenians had been directed specifically at her. She had been stopped several times by soldiers because her hair wasn't properly covered or bound. After she left, her school was closed. Her church was attacked when she was at the church. After she left Iran, the soldiers came to her family several times and asked where are the children. So even though her family, for some reason her parents were safe, were not being disturbed in Iran, it was clear that the Iranian authorities were directing their attention at the petitioner. That case is thus distinguishable from the present case. The petitioner has suggested that there, in his argument, that there's a pattern and practice of persecution of Chinese, ethnic Chinese in Indonesia. The evidence does not bear that out. And, indeed, earlier today it seemed like he was conceding that there's not a pattern and practice and that not every Indonesian Chinese would be eligible for asylum. The evidence shows that though there is discrimination and Chinese are frequently harassed, that that does not amount to a systematic government-wide policy of persecution of the Chinese. Do you happen to know whether there's any case pending here or anywhere in which that argument has been where the argument is pending where there has been an effort to show a pattern of practice? In Indonesia or just generally? No, in our court. Whether this is coming up in other cases? I have run into that argument. I can't think for the moment which countries were involved. But I think it's clear that in the case law that it really has to be a very systematic practice by the government of persecution of the group at issue. For example, I can't think of like I would think Serbia, Bosnia, that situation. I think there was a case addressing it in that context where there was. Isn't there a case from the Sixth or the Eighth Circuit that holds that conditions in Indonesia do not amount to a pattern and practice case? I'm not aware of that case. But I would agree with that conclusion based on what I've read of the State Department reports and the case law. I just want to point out that that issue was not raised in Petitioner's brief and has not really been briefed before this court. So I'd argue that it's been waived in any event here. That's why I was asking whether it had been raised and preserved in any other case. I'm not aware of it. I can't identify a specific case right now. I don't think there are any further questions. If I may just make a comment about the documents issue. The immigration judge had made a comment that some originals had not been submitted. Indeed, the petitioner had not submitted an original of his passport because as a crewman he had been required to surrender that, so he didn't have it. In any event, the issue of whether originals or copies of documents were submitted was irrelevant to the immigration judge's decision. He did credit the petitioner's claim that he was an ethnic Chinese and didn't express any doubts about that, and that didn't play a part in his ruling. With that, Your Honor, I will submit the case. Ryan, do you wish to add anything? It's true that I did state earlier that not in, I think, answer to Judge Rollinson's question, that not every ethnic Chinese person, just by being ethnic Chinese, would necessarily be eligible for asylum. But I also did at that very point cite from Singh, V.I.N.S., 94, Feb. 3, 1353 to 1359. Again, the Ninth Circuit in that case said, merely because all members of the persecuted group might be eligible for asylum. On that note, unless there are any questions, I'd like to submit the case. Thank you. Thank you, Judge. The case just argued is submitted for decision. I think that having been on this Court a very long time, I have never heard a lawyer argue six cases in a row, and I think that you have earned your keep. Thank you. You know what? I looked at the case schedule. I had to make sure it didn't say April 1st. We'll hear the next case, which is United States v. Sejal Lopez.
judges: Schroeder, Tashima Rawlinson